McKEEFREY et al. v. CONNELLSVILLE COKE & IRON CO., to use of H. C. FRICK COKE CO.

(Circuit Court of Appeals, Third Circuit. June 6, 1893.)

**1. CONTRACTS—CONSTRUCTION—USAGE.**

A coke manufacturing company agreed by written contract to furnish to defendant at his furnaces 15 cars of coke per day for 6 months at an agreed price per ton. The coke company, however, were "not to be held in damages for the railroad company's failure to supply transportation." *Held*, that this contract was to be read in the light of the surrounding circumstances, and was, therefore, subject to a custom prevailing among coke producers of that region, and known to both parties, to distribute, in case of shortage of cars, all the cars received proportionally among the orders on hand; and defendant had no ground of complaint if he received his proper proportion of cars during the period of the shortage.

**2. SAME.**

Shortly after the making of the contract the coke company sold its plant to plaintiff, a larger coke company, and the contract was assumed by plaintiff, and defendant, being notified thereof, made no objection, but accepted coke from plaintiff. *Held*, that plaintiff was bound to fulfill the contract, but that it was bound to apportion the cars to defendant, not according to all the orders which plaintiff had on hand, but according to the orders which the original contractor had on hand, unless both apportionments would produce the same result.

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

At Law. Action by the Connellsville Coke & Iron Company, for the use of the H. C. Frick Coke Company, against William D. McKeefrey and William D. Hofius, partners as McKeefrey & Hofius, to recover the price of certain coke delivered under a contract. The case was tried to the court without a jury, which rendered judgment for plaintiff. Defendants bring error. Affirmed.

S. Schoyer, Jr., for plaintiffs in error.

Willis F. McCook, for defendant in error.

Before ACHESON and DALLAS, Circuit Judges, and BUTLER, District Judge.

BUTLER, District Judge. The defendants in error brought two suits against McKeefrey & Hofius to recover the price of coke delivered to the latter at different dates, in pursuance of a contract made July 6, 1889. By agreement they were tried together, and as the questions raised in each are the same, they may hereafter be treated as one.

The court, before which they were tried, (without the aid of a jury,) found the following facts:

"First. On July 6, 1889, a contract between the Connellsville Coke & Iron Co. and McKeefrey & Hofius, the defendants, was made as follows:

"'Pittsburgh, July 6, 1889.

"'Messrs. McKeefrey & Hofius, Leetonia, Ohio—Gentlemen: We agree to furnish you with all the Connellsville coke you will require at your furnaces at Leetonia, while in blast, up to 15 cars per day, for the period of six months from July 1 to December 13, 1889, at one dollar two and a half cents ($1.02½) per ton of 2,000 lbs. f. o. b. cars at ovens. Settlements to be based on railroad weight on scales nearest loading point, and are to be in cash on the 25th day of each month following shipment. We are not to be held in damages for the railroad company's failure to supply transportation, strikes at mines, or other causes of delay beyond our control; neither will we compel you to receive the coke should your furnaces be out of blast during the period of this contract. Yours, very truly, The Connellsville Coke & Iron Co.

"'F. P. Hyndman, G. S. A.

"'Accepted. McKeefrey & Hofius.'

"At this time negotiations were pending for the sale of the H. C. Frick Coke Company, the plaintiffs, of the Connellsville Coke & Iron Co.'s plant. This was done by agreement of July 10th, the actual transfer taking place on August 1st; the contract was assumed by the Frick Company. Of this transfer and assumption the defendants were informed July 18th, made no objections, and thereafter ordered and accepted shipments from the Frick Company. That, to October 12th, they ordered 605 cars of coke from the Frick Company; of this number there were delivered 397 cars, as follows: Railroad cars, 174; individual cars of H. C. Frick & Co., 223.

"Second. That there is generally in the fall of each year a scarcity of cars for the transportation of coke, caused by the movement of western crops to the seaboard. In the fall of 1889 this scarcity was greater than usual; that at all times the Frick Company had on hand sufficient Connellsville coke to supply all orders; that they made daily demands on the railroad companies for cars to fill defendants' and other orders on hand; that they were unable to get the necessary cars, and this was the cause why the defendants' orders were not filled; that this shortage continued until January, 1890.

"Third. That on October 12, 1889, there being then a shortage of 208 cars in defendants' orders, a modification of the said contract was made in writing as follows:

"'Pittsburgh, Oct. 12, 1889.

"'H. C. Frick Coke Co., Pittsburgh, Pa.—Gentlemen: Recognizing that the shortage of our coke supply is entirely due to the great scarcity of cars, and that we have no call upon you to ship us coke in your individual cars, we will pay you sixty (60) cents per ton more f. o. b. ovens than the price named in our contract with the Connellsville Coke & Iron Co. We make this offer because we feel that any coke we are able to secure in individual cars will be just so much extra coke, which on account of the great scarcity of railroad cars, we could not expect you to ship under the above contract. If you accept this offer, please advise how many individual cars you could ship us daily. McKeefrey & Hofius.'

"'Pittsburgh, Pa., Oct. 12, 1889.

"'Messrs. McKeefrey & Hofius, Leetonia, Ohio—Dear Sirs: In reply to your favor of this date, would say that we accept your offer and will do our utmost to ship you an average of five (5) individual cars daily.

"'Yours, very truly, H. C. Frick Coke Co.

"'C. H. Spencer, General Agent.'

"That in executing this paper and in the negotiations prior thereto, no misrepresentations whatever were made, or fraud practiced by the plaintiffs, the Frick Coke Company, or its officers, but that the agreement was made and signed by W. D. McKeefrey, on behalf of defendants voluntarily.

"Fourth. That when the contract of July 6, 1889, was made, there was a custom amongst the producers of Connellsville coke, in case of car shortage, to distribute the cars received proportionately amongst the orders then on hand, giving the preference to orders for blast furnaces as against foundry

orders. That this custom prevailed in the trade and was known to the defendants.

"Fifth. That during the season of 1888, the Connellsville Coke & Iron Company had a contract with defendants similar to the one in suit. That during the car shortage of that year the cars were distributed to defendants in accordance with the custom above mentioned. That no objections were made by defendants. That the same course was pursued by the Frick Company under the present contract, and a distribution of cars made on said basis, and in addition thereto, individual cars were furnished in excess of said proportionate amount up to October 12th, without additional charge. That including the said individual cars, the defendants had, at the various dates noted below, received in excess of the proportionate number due them under the custom referred to, cars as follows: August 31st, 42 cars in excess; September 30th, 169 cars in excess; November 30th, 186 cars in excess; December 31st, 237 cars in excess. That complaint was made by defendants that they did not get all the coke they ordered, and that the plaintiffs were bound to use their individual cars to furnish them coke, but no complaint was made of the proportionate distribution of the railroad cars. That this distribution was ratified and approved by defendants, by the payment, without protest, on each succeeding month for the coke delivered during August, September and October. That defendants abandoned by the paper of October 12th the claim that the Frick Company were bound to use their individual cars in supplying coke under the contract of July 6, 1889.

"Sixth. That the distribution of cars by the railroads in case of shortage was made on the basis of oven capacity, not of actual production.

"Seventh. That on August 1st, when Frick & Company took possession of the Connellsville plant, the oven capacity of the latter was 113 cars per day; the contracts they then had were for 109½ cars per day, or 96 per cent. of their product. These contracts included one of Laughlin & Co., for 40 cars. This was an order from month to month, and had been in force before July 6, 1889. The amount of the August order was not fixed until July 22d. By the custom found, this furnace order would be entitled to proportionate distribution at any subsequent shortage. That on August 1st the Frick Company had an oven capacity of 576 cars; had contracts for 421 cars or 73 per cent. of product. In September (including the Connellsville Company plant) it had an oven capacity of 754 cars and contracts for 678 cars, or 90 per cent. of product. In October it had an oven capacity of 801 cars and contracts for 715 cars, or 89 per cent. of product. In November an oven capacity of 812 cars and contracts for 715 cars, or 88 per cent. of product. In December an oven capacity of 812 cars and contracts for 698 cars, or 85 per cent. of product. That from the position of the Frick & Co. works the coke could be more quickly transported than from the Connellsville plant, and in times of shortage it was more difficult to get the railroads to haul the cars to remoter plants. That the Connellsville Company had no individual cars. We find as a fact that the facilities for filling defendants' contract were increased by the transfer of the contract to Frick & Co., by reason of the relative amounts of the Frick Coke Co.'s orders, its capacity, the distribution of cars by the railroad, and the location of works as compared with the status of the Connellsville Coke & Iron Company.

"Eighth. We find that the balance claimed as No. 14, November term, 1890, of $3,572.06, with interest from 25th December, 1890, is for the coke delivered by the Frick Coke Company, the plaintiffs, to the defendants, and the same has not been paid. We also find that the balance at No. 15, November term, 1890, of $4,593.38, with interest from January 25, 1890, is for coke delivered by plaintiffs to the defendants, and the same has not been paid."

From these facts the court found—First, that the defendants (below) accepted the Frick Coke & Iron Company's assumption of the Connellsville Coke Company's obligations to them; second, that the defendant's agreement of October 12, 1889, had reference to the coke covered by the original contract, and was a modification of that contract to the extent of adding 60 cents per ton for coke

furnished in the Frick Coke & Iron Company's cars, as therein specified; third, that the contract should be read in the light of surrounding circumstances, including the usages of the business to which it relates, and that when thus read the plaintiffs were only required to furnish 15 cars per day when an equal apportionment between all their orders for coke of all cars furnished them by the railroad company entitled the defendants to that number; that for any shortage arising from such a distribution the plaintiffs were not responsible; and that the plaintiffs, having complied with the contract thus construed, were entitled to recover the money sued for.

To the court's findings, and admission of testimony, a very large number of exceptions were taken; and 21 errors are assigned. It is apparent, however, that the material questions involved are few. The counsel for the plaintiffs (in error) states them in his brief as follows:

"(1) Whether usage, if proved, could be permitted to vary the contract. (2) Whether the evidence offered was sufficient to sustain the alleged usage. (3) Whether the usage as proved was void for any cause. (4) Whether such usage, if proved, could be applied to the business of the H. C. Frick Coke Company, who had assumed the fulfillment of the original contract. (5) The extent to which such usage could be applied in these causes. (6) Whether the H. C. Frick Coke Company was bound to fulfill the contract of the Connellsville Coke Company, or whether any other contract with the Frick Coke Company had been substituted therefor. (7) Whether sufficient proof had been offered by the plaintiffs below of a fair apportionment of cars to the defendants below. (8) Whether the arrangement of October 12, 1889, for the payment of an excess of 60 cents per ton over the original price per ton, constituted a new contract, or was a modification of the original contract."

These points raise the following questions: First. Was the court right in admitting evidence to aid in construing the contract, and is its construction correct? Second. Was the Frick Coke & Iron Company "bound to fulfill the contract of the Connellsville Coke Company?" Third. Was there "sufficient proof of a fair apportionment of cars to the defendants?" Fourth. Was the agreement of October 12, 1889, an independent one or a modification of the original? A disposition of these questions will dispose of the case.

As respects the first, we have seen that the contract was for a sale of coke, deliverable at the ovens, in quantities "up to fifteen cars per day," at a stated price—the plaintiffs not to be "held in damages for the railroad company's failure to supply transportation." In the light of the evidence the court construed it as binding the plaintiffs to furnish 15 cars per day, if that number of cars could be obtained for its transportation, in pursuance of the common usages of the business; but not otherwise. The defendants' real cause of grievance, if they have any, consists in this construction, and the method pursued in reaching it. Was the court wrong? No one reading the contract in ignorance of the circumstances surrounding the parties, and the common usages of the business to which it relates, could form a reliable judgment of its meaning. Parties always deal with reference to such cir-

cumstances and usages. There is much in their minds, mutually understood, which their language does not directly express. When, however, the language is read with knowledge of the circumstances under which it was used, their mutual understandings, implied as well as expressed, distinctly appear. Consequently contracts are always to be so read. When the contract here involved is thus read it seems entirely clear that the court's interpretation is right. The defendants complain that evidence was heard to show that in the purchase and sale of coke, to be transported by railroad, when there is an insufficient number of cars to supply the demands of the trade, railroad companies distribute their cars among producers in proportion to the requirements of each, so that the deficiency is equally borne; and that producers distribute the cars assigned them ratably among their orders, so that purchasers shall equally share in the shortage; that this is a usage of the trade, so common as to be known to all dealers. This evidence, in our judgment, was clearly admissible. Not only are the defendants presumed to have had knowledge of the usage, but it is proved they had, and that they acted upon it in former dealings. The evidence was necessary to place the court in the situation of the parties when they contracted, and thus enable it to understand the meaning of their language. It was not heard to change or vary the language, but simply to enable the court to understand it as the parties presumably did, when it was employed. It is of no importance whether the usage be called a "custom," or by any other name; it was one of the circumstances surrounding the parties and their transaction, which was presumably in mind when the contract was written. Fifteen car loads per day were to be supplied; but the plaintiffs were not to "be responsible for the railroad company's failure to furnish transportation." As before stated, one having no knowledge of the usages of such business would not understand this language—would not understand that it refers to a failure by the railroad company to furnish cars, as well as the means of transporting them. No question, however, is made in this regard; it is conceded that the company was to furnish cars, in pursuance of the common usage. It failed to furnish the requisite number. If the plaintiffs had supplied coke to the defendants for all the cars furnished, "up to fifteen per day," of course it could not be pretended that this was not a compliance with their contract, though the number of cars might fall short of 15. The defendants say, however, that as the plaintiffs received a sufficient number to fill their order, (if none had been applied to others,) they should have had the 15 cars. But the common course of dealing in such cases, as the evidence shows, requires the manufacturer of coke to divide his supply of cars ratably among all orders, on hand when the shortage occurs. Thus we are enabled to understand what is meant by the terms "not to be held responsible in damages for the railroad company's failure to supply transportation," which qualify the preceding obligation to furnish 15 cars per day. They plainly mean a failure to supply cars and

other means of transportation equal to the demands of the trade.

The contention that the plaintiff should have supplied them with all the cars received from the railroad company, up to the required number, and if not, that a distribution should have been made upon the basis of the orders on hand at the date of the contract, is not only against common usage, as we have seen, but is unreasonable. If sustained it would be destructive to the trade. No manufacturer could continue his business under such a rule. To answer that parties can guard against the danger by contracting accordingly, and that this contract is to be construed as contended for because the usage is not written into it, does not help the defendants. No sensible man would so contract as to destroy his business, and in contemplation of law the usage is written into this contract. Bliven v. Screw Co., 23 How. 420-429; 1 Greenl. Ev. § 292; Robinson v. U. S., 13 Wall. 363; McMasters v. Railroad Co., 69 Pa. St. 374.

As respects the second of the foregoing questions the answer must be an affirmance. The Frick Coke & Iron Company were certainly bound to fulfill the contract of the Connellsville Coke Company. It must appear that they did so; and it does appear. The court finds that the plaintiffs applied to the defendants' orders all the cars the latter were entitled to, of the number furnished by the railroad company. It is true that the Frick Coke & Iron Company apportioned the cars received among all their orders on hand when the shortage occured; and if this did not result in the same thing to the defendants that a supply of cars by the railroad company to the Connellsville Coke Company and an apportionment by them of the cars to their orders (in case they had continued business) would have done, the defendants did not get all they were entitled to. It did, however, result in the same thing. While it is true that the business conducted by the Frick Coke & Iron Company was very much larger than that conducted by the Connellsville Coke Company, and their orders consequently were much more numerous, yet inasmuch as the railroad company's cars were ratably distributed in proportion to the business of each manufacturer, and subsequently applied by the manufacturer ratably to his orders, it follows that the defendants received all the coke they were entitled to, in view of the shortage.

As respects the third question, we think the proof was sufficient to justify the court in finding the apportionment to be just.

The fourth question—was the agreement of October 12, 1889, an independent one, or a modification of the original contract—we do not regard as material to the case. The agreement was, as the court has found, a modification simply of the original contract—an undertaking to pay 60 cents per ton additional to the contract price for so much of the 15 car loads per day originally purchased as the shortage in transportation might leave unprovided for. Nevertheless these extra cars could only be employed to the extent which the actual shortage of railroad company cars rendered necessary. Thus the agreement of May 12th did

not excuse the plaintiff from loading all the railroad company cars available for the purpose. It is clear, however, and the court has so found, that the plaintiffs did load all such cars. The question does not therefore seem to have any practical importance.

Finding no error in the several assignments the judgment is affirmed.