CLEVELAND-CLIFFS IRON CO. v. EAST ITASCA MINING CO.

(Circuit Court of Appeals, Eighth Circuit. May 9, 1906.)

No. 2,325.

1. MINES AND MINERALS—LEASES—ASSIGNMENT—CONTRACT—CONSTRUCTION.

A contract for the assignment of certain mining leases required plaintiff to pay defendant within 6 months from date 7 cents for each ton of ore averaging 56 per cent. of iron found as a result of exploration work conducted with reasonable diligence during a period of 6 months. The contract also required plaintiff to thoroughly explore the land, so as to fairly determine the character and extent of the deposit of iron ore therein. Held, that such clause only required the explorations to be reasonably and fairly conducted in the usual manner, so as to determine, with as much certainty as that kind of an exploration would permit, the character and extent of the ore deposit.

2. SAME.

A provision of the contract requiring plaintiff to furnish defendant a true report, showing the "substance encountered," should be construed only to require plaintiff to disclose the substance encountered by the kind of exploration and development adopted by the parties to test the same.

3. SAME.

A contract for the assignment of certain mining leases on iron land provided that plaintiff should pay defendant 7 cents per gross ton of 2,240 pounds for all iron ore discovered and shown to exist. The contract otherwise provided for customary explorations, which under the custom of the country were treated as showing the character of the earth for a distance of 100 feet on each side of the drill hole. Held, that the contract bound plaintiff to pay defendant 7 cents per gross ton for all iron ore discovered or shown to exist by the completed explorations reasonably and fairly made on the land within the time specified, and the contract did not contemplate the ascertainment of the actual quantity of ore existing within the premises.

4. PAYMENT—QUASI CONTRACT—MISTAKE OF FACT.

Where a contract for the assignment of leases on iron land provided for payment of 7 cents per gross ton for all iron ore discovered or shown to exist by the completed explorations reasonably and fairly made, based on a customary assumption that a drill hole would properly disclose the condition of the earth within a radius of 100 feet, etc., but. notwithstanding accurate calculations and computations, it turned out that such assumption was erroneous, or that any other assumed fact on which the exploration was based was false, plaintiff was not entitled to recover a portion of the consideration paid as the result of such computations, on the theory that the payment was made by a mistake of fact.

In Error to the Circuit Court of the United States for the District of Minnesota.

William P. Belden and Horace Andrews (H. J. Grannis and Hoyt, Dustin & Kelley, on the brief), for plaintiff in error.

Oscar Mitchell (J. L. Washburn and W. D. Bailey, on the brief), for defendant in error.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge. The Cleveland-Cliffs Iron Company sued defendant in error, the East Itasca Mining Company, to recover $92,-

000, alleged to have been paid the latter by mistake as excessive consideration for an assignment of two mining leases. The leases were assigned pursuant to a preliminary contract between the parties. Defendant claims that the contract creates a conclusive criterion for settling the price to be paid by plaintiff for the leases, and that the price as paid conformed accurately to the criterion created; that if there was any mistake, it was a mistake in judgment in agreeing upon the criterion. Plaintiff claims that the contract did not create a criterion, and if it did that there was such a mistake in its subsequent application or operation as entitles it to recover. The true interpretation of the contract must therefore be determined.

The defendant was the owner of several leasehold terms of 30 years in properties located on the Mesaba Range, in Itasca county, Minn., upon which it had been conducting explorations for iron ore. On July 8, 1902, plaintiff and defendant entered into a written contract for the assignment of the leaseholds to plaintiff. Those numbered 2 and 3 are the subjects of this litigation. One of the preliminary recitations of the contract is as follows:

"Whereas, the said Cleveland-Cliffs Company is desirous of acquiring the said properties for the purpose of exploring the same for iron ore, and for the purpose of acquiring mining leases thereon, if iron ore in desirable quantities and of suitable quality shall be found to exist therein."

This recitation affords a key to what follows. The first clause of the contract provides that it is made in "consideration of the payments to be made by said Cleveland-Cliffs Company to the said Itasca Company, as hereinafter specified." Then, after providing for the payment of certain royalties and costs of exploration work already done by defendant, the contract proceeds thus:

"And said Cleveland-Cliffs Company agrees to enter upon the said leased premises, and with the said five drills [referring to certain churn and diamond drills which had been used on the premises by defendant company] and competent crews to operate the same, and such other drills and crews as it may see fit to put thereon, proceed with the work of exploring said premises for iron ore; and shall thoroughly explore the lands covered by said leases numbered two (2) and three (3) within six months from this date, so as fairly to determine the character and extent of the deposit of iron ore therein; such exploration to be conducted to the mutual satisfaction of the parties hereto. And in case a difference arises as to whether such lands have been fully and fairly explored for the purposes above set forth, in that event such difference shall be determined by E. J. Longyear, of Hibbing, Minnesota, who is hereby agreed upon as a referee for such purpose, and whose determination in that regard shall be final and binding upon the parties. And if upon the determination of said Longyear it shall be that such lands have not been fully and fairly determined as to quantity and quality, then the said Cleveland-Cliffs Company shall at once continue such explorations, and complete the same as fast as practicable, using not less than four drills in the conduct of such work. The said Cleveland-Cliffs Company further agrees that upon the exploration being completed on or before six months from this date, it will pay to the said Itasca Company the sum of seven (7) cents per gross ton of 2,240 pounds, for all iron ore discovered and shown to exist on, in, or under said lands covered by said leases numbered two (2) and three (3), which will average 56 per cent. or better in iron, all ore to be figured in the calculation of such average that is so situated as to be practically mined from said premises, the mines being operated in the usual workmanlike and minerlike fashion. * * * The said Itasca Company, upon such payment being made

and simultaneously therewith, hereby agrees to execute and deliver to the said Cleveland-Cliffs Company, its successors or assigns, good and sufficient assignments of the said mining leases numbered two (2) and three (3), granting thereby to the said Cleveland-Cliffs Company all the right, interest, estate, and privileges therein granted by the lessor to the said Itasca Company; * * * that the said Cleveland-Cliffs Company shall, from time to time, and as near as may be on or about the 1st or 15th days of each month during the progress of such work of exploration and development, furnish to the said Itasca Company a true report thereof, showing the location of the various test-pits and drill holes, and the substance encountered therein, together with average samples of ore of each five (5) feet of ore, and shall also furnish a copy of the assays for the determination of iron and phosphorous on average samples of each five (5) feet of ore. * * * "

Unusual conditions apparently confronted the parties at the time this contract was made: (1) Plaintiff wanted the leaseholds for the ultimate purpose of mining iron ore. (2) The amount of iron ore was necessarily uncertain and doubtful, and would so remain until the whole territory should be thoroughly and exhaustively mined. (3) Plaintiff could not carry on mining operations proper until it secured the leaseholds. (4) It could not secure the leaseholds, until it made payment therefor in the manner prescribed by the contract. (5) The explorations were to be thorough, "so as fairly to determine the character and extent of the deposit of iron ore."

The evidence shows that the usual and customary manner of exploring by drill holes was to bore through the earth with a drill enclosed in surrounding casements, force water down the drill hole so as to return through the surrounding aperture made by the outer casement, bringing with it the substances produced by the operation of the drill, and depositing the same in a vessel of water, where by the process of settling the solid substances go to the bottom of the vessel, and, after the water is drawn off, become subject to examination and analysis. The evidence further shows that a uniform custom pervades the iron regions of the Mesaba Range to assume, for the purpose of exploring for iron ore, that what is actually found in any 5 feet of each drill hole pervades the ground laterally for a radius of 100 feet; that 13 cubic feet of ore make a ton; that the product brought up from the drill hole discloses the true quantity and quality of ore encountered by the drill; that these, and other assumptions not necessary to mention, are customarily indulged in estimating the value of ore-bearing lands; and that traders act upon them, and buy and sell according to their showing. Notwithstanding these customs and assumptions, either one of the latter may, in individual instances, obviously be erroneous. No mere exploration of the kind referred to can, in the nature of things, disclose with absolute certainty how much or what quality of ore exists in the bowels of the earth. Accordingly, contracts for buying and selling ore lands always deal with a doubtful and uncertain subject of sale, and if parties wish to purchase outright, and secure title in anticipation of exhaustive mining, they must proceed largely by approximation. Contracts are frequently made in the light of customary dealing and common usage, and when so made such custom and usage enter into and form part of the contract as fully as if they were incorporated in it. 1 Story on

Contracts, § 794; Robinson v. United States, 80 U. S. 363, 20· L. Ed. 653; Hostetter v. Park, 137 U. S. 30, 10, 11 Sup. Ct. 1, 34 L. Ed. 568; Albion Phosphate Min. Co. v. Wyllie, 23 C. C. A. 276, 77 Fed. 541.

An agreement must be interpreted so as to give effect to the intention of the parties. This is the great cardinal rule of construction of contracts. To that end the four corners of the instrument must be examined to ascertain the meaning of any of its stipulations, and each of them must be construed so as to give effect to all, if possible. The language employed must be construed in the light of the subject-matter and the circumstances surrounding the parties at the time the contract was made. 1 Story on Contracts, § 774 et seq.; Nash v. Towne, 5 Wall. 689, 18 L. Ed. 527; Barreda v. Silsbee, 21 How. 146, 16 L. Ed. 86; McKeefrey v. Connellsville Coke & Iron Co., 5 C. C. A. 482, 56 Fed. 212.

Considering the provisions of the contract in question in the light of the foregoing rules of construction and in the light of established and uniform usage and custom, we are brought to the following conclusions: (1) That its true construction required the plaintiff to pay the defendant, within six months from its date, the price of 7 cents for each ton of ore averaging 56 per cent. or better of iron found as a result of exploration work of the usual and customary kind, conducted with reasonable diligence during that period of time. (2) That upon such payment being made defendant bound itself to make due and proper assignments of the two leaseholds to plaintiff. (3) That the clause of the contract relied on by plaintiff's counsel to show that the parties contemplated the ascertainment of the actual ore in the premises, namely, "and shall thoroughly explore the lands, * * * so as fairly to determine the character and extent of the deposit of iron ore therein," cannot be read alone, but must be read in connection with all the other clauses and implications of the contract; and when so read the clause requires the exploration to be so reasonably and fairly conducted, in the usual way, as to determine with as much certainty as that kind of an exploration will permit the character and extent of the deposit of iron ore. (4) That the other clause relied on by plaintiff's counsel, namely, that which requires plaintiff to furnish the defendant a true report, showing the "substance encountered," cannot mean an absolutely true showing concerning the substance encountered, but does mean a showing as disclosed by the kind of exploration and development adopted by the parties to test it.

The other clause relied on by plaintiff's counsel to show that the parties contemplated the ascertainment of the actual quantity and quality of iron ore in the premises is found in that part of the contract relating to payment where plaintiff agrees to pay defendant "the sum of 7 cents per gross ton of 2,240 pounds for all iron ore discovered and shown to exist," etc. This clause must also be read in connection with the others, and, when so read, must necessarily be qualified by those provisions for making the exploration, so as to read, substantially, that plaintiff agrees to pay defendant 7 cents per gross ton "for all iron ore discovered and shown to exist by the completed explorations reasonably and fairly made," as already explained. Obviously, they

could not intend at the end of six months to require payment for all iron ore existing in the lands, for it could not be determined.

The contract in question, when construed in the light of all its terms and implications, furnished data for and erected a criterion from which to determine the value of a doubtful and uncertain subject. Neither party could accomplish the purposes of the contract, taken as a whole, without resort to some criterion; and, having so resorted to it, and having incurred corresponding obligations, neither will be allowed to disown or repudiate the criterion so voluntarily adopted.

In Barreda v. Silsbee, 21 How. 146, 16 L. Ed. 86, the Supreme Court, in dealing with a kindred subject, says:

"Parties have the right to select what criterion they please, and where their contracts are fairly made they must receive a reasonable construction, so as to carry their intention into effect; and, in general, that intention must be gathered from the language employed, the surrounding circumstances, and the subject-matter."

The clause of the contract requiring exploration to be conducted to the "mutual satisfaction of the parties," and creating Longyear a referee to determine in case of a difference between them as to whether the land had been fully and fairly explored, does not militate against the construction we have adopted. The parties contemplated good faith and reasonably diligent exploration, to the end that the land should be fully and fairly explored within the time fixed; but in order to secure that result and prevent any miscarriage of a well-understood purpose, they made provision for an umpire to determine the matter. The construction put upon this provision by the parties, which will be referred to later, is a reasonable one, and discloses a practical execution of the contract, in harmony with its main purpose, and consistently with all its provisions.

Was any mistake made by the parties in carrying out the method or applying the criterion adopted? If both parties made an actual mistake in computation of the results shown by the exploration as made, or in calculating the areas of the land surrounding the drill holes, whose mineral substances, it is conceded, were to be fixed by the showing made in the drill holes, and by such mistake had over or under paid the price agreed upon, a remedy under well-recognized equitable principles would be afforded to correct the mistake. It would involve no rescinding or denial of the agreement, but would be in affirmance or execution of it. But if, notwithstanding accurate computations and calculations, it turned out that the assumption that 100 feet area surrounding each hole contained the kind and quality of ore disclosed in the drill hole, or any other assumption connected with the exploration, was false, such falsity would confer no right of action. The parties by arranging for exploration of the land without critically defining how it was to be done adopted the usual and customary explorations of the region. See cases, supra.

The contract, as a whole, is obviously pregnant with assumptions adopted by the parties in order to accomplish the main purpose of making provision for assigning the leases and payment of the con-

sideration therefor before practical mining operations should begin. But it is contended that by reason of what is called unexpected and unusual decomposed taconite in strata, which some of the drills penetrated (which was not discovered or known to exist until the explorations were completed, the property paid for, and the leases assigned), the force pump which brought up from the drill holes specimens of the substances through which the drills passed brought up much of this taconite, which, instead of settling in the bottom of the vessel, remained, by reason of its fineness, in suspension, and ultimately flowed off with the water, leaving the iron ore which settled in the bottom of the vessel apparently of higher grade than it really was or would have been determined to be if the taconite had been deposited with it, and thereby made subject to calculation; that, as a result of this unexpected presence of taconite, the deposit which settled at the bottom of the vessel did not disclose the real substances brought out by the operation of drills. The mistake relied on arises from the fact that this unusual substance was encountered when the parties did not expect it to be encountered. Is such a discovery, made after the explorations provided for by the contract were completed, a mistake, for which recovery can be had in this action? We think not. The presence of the unusual taconite was a contingency, like the possibility of variation of the quality of ore within the radius of 100 feet, or like other possible departures from the usual and ordinary conditions relating to the deposit of iron ore of which, for want of any possible data of absolute certainty, the parties assumed the risk. The contract discloses on its face that the parties at the time of its execution had knowledge of the possibility of the existence of taconite in the leasehold premises in question, and that taconite might be encountered by the drills. Clause 6 of the contract reads as follows:

"It is agreed between these parties that whenever the term 'thoroughly explore for iron ore' is used in this agreement, and in all cases where it is herein provided that the said Cleveland-Cliffs Company shall thoroughly explore the premises hereinbefore described for iron ore, that it shall not be deemed that such premises have been so explored in cases where taconite shall be encountered, unless such taconite is either penetrated through the entire body thereof, or at least to a depth of 100 feet in three holes in each forty (40) acres, unless the said referee, E. J. Longyear, hereinbefore mentioned, shall notify the parties upon an examination thereof that he deems such work unnecessary or useless."

No claim is made by either party of any right or privilege arising under this clause of the contract, and reference is made to it only for the purpose of showing that the parties had in mind at the time the contract was made the possibility of encountering taconite, and for that reason its presence in the earth cannot properly be said to be unexpected. With knowledge of the possibility of this substance being encountered, the parties nevertheless adopted the customary method of exploring the premises by drill holes and test-pits as the criterion for determining the consideration which should be paid for the leaseholds. They probably knew from that large and general experience which alone could make any method of exploration customary that it afforded the most available and satisfactory criterion for measuring

the value of the unknown and uncertain substances in the earth, and when they fairly adopted such a criterion for determining such values they cannot complain because of the very uncertainties which induced them to adopt it.

Pomeroy on Contracts, § 239, lays down the doctrine as follows:

"Where parties have knowingly entered into a speculative contract—that is, one in which they intentionally speculate as to the result—and the facts upon which such agreement was founded, or the event of the agreement itself, turn out very different from what was expected or anticipated, this error, miscalculation, or disappointment, although relating to matters of fact and not of law, is not such a mistake, within the meaning of the equitable doctrine, as entitles the disappointed party to any relief either by way of defeating or rescinding the contract. In such classes of agreements the parties are supposed to calculate the chances, and they certainly assume the risks."

Beach, in his work (Mod. Eq. Jur. Vol. 1, § 56), states the rule thus:

"Relief will not be given on the ground of mistake where the subject-matter of the contract is of a doubtful or uncertain character or kind." See cases there cited.

In United States v. Barlow, 132 U. S. 271, 281, 10 Sup. Ct. 77, 33 L. Ed. 346, Mr. Justice Field, speaking for the court, says:

"It is also true that where the subjects in relation to which the contract of parties is made are necessarily of an uncertain and speculative character or value, and that is known to the parties, a mere mistake by them in their estimate of the value is not deemed sufficient to authorize a recovery of the moneys paid upon the erroneous estimate."

This court, in Chicago & N. W. Ry. Co. v. Wilcox, 54 C. C. A. 147, 116 Fed. 913, 915, considering a kindred subject, observes:

"Where parties have knowingly and purposely made an agreement to compromise and settle a doubtful claim, whose character and extent are necessarily conditioned by future contingent events, it is no ground for the avoidance of the contract that the events happen very differently from the expectation, opinion, or belief of one or both of the parties."

In Eastman v. Water Power Co., 24 Minn. 437, 443, the court says:

"When the fact is doubtful from its own nature, in every such case, if the parties have acted with entire good faith, a court of equity will not interpose, for in such cases the equity is deemed equal between the parties."

See, to the same effect, Buffalo v. O'Malley, 61 Wis. 255, 20 N. W. 913, 50 Am. Rep. 137, and 1 Story Eq. Jur. § 150.

The exploration provided for by the contract, and upon the results of which plaintiff agreed to pay for the leaseholds, lacked in many respects that degree of certainty which is usually desired and attained. It involved many elements equally as uncertain and doubtful as the false assumption relied on by plaintiff that the pump would bring up and disclose in the bottom of the settling vessel true information concerning the substances through which the drill passed. But the parties contracted in view of all these uncertainties, and by reason of them agreed upon a criterion which they could practically apply and thereby accomplish their purposes.

In the light of the foregoing facts and authorities, we are irresistably brought to the conclusion that plaintiff cannot be released

from the obligation of the contract because one of the elements of uncertainty was largely disappointing. The others may have turned out more favorably than was expected. The parties agreed upon a result disclosed by all of them operating together, and one party cannot be heard to complain of an unfavorable showing made by one element, any more than the other party can be heard to complain of favorable showing made by other elements.

If any doubt exists concerning the true construction of the contract in question, resort can be had to that construction which the parties themselves placed upon it. The complaint discloses that the explorations were made in the manner provided by the contract and "by the methods approved and ordinarily employed by engineers in that locality." It appears beyond question that Longyear, who was the referee agreed upon to determine when the premises "had been fully and fairly explored for the purposes set forth," at the end of the six months' period decided that the property had then been fully and fairly explored, and when such decision was made the assignments of the leases were executed by the defendants, and the purchase money paid according to the result of the finished explorations.

Without entering further into detail, it can safely be said that the parties proceeded from and after the date of the execution of the contract, July 8, 1902, for and during the full period of six months, to treat the contract as requiring them to settle on the showing made by the explorations at the end of the six months, and the evidence is that at that time they settled accordingly.

This court, in the case of Long-Bell Lumber Co. v. Stump, 30 C. C. A. 260, 86 Fed. 574, 578, said:

"There is no better established rule, or one more instinct with the spirit of equity in the construction of contracts wanting in perspicuity or clearness of meaning, than to adopt that which the parties, by their course of dealing, place upon it before any controversy arose between them."

This court also said in the case of Housekeeper Pub. Co. v. Swift, 38 C. C. A. 187, 97 Fed. 290, as follows:

"The practical interpretation given to their agreements by the parties to them, while they are engaged in their performance, and before any controversy has arisen concerning them, is one of the best indications of their true intent, and courts that follow it rarely go far astray."

See, also, to the same effect, Chicago G. W. Ry. Co. v. Northern Pacific Ry. Co., 42 C. C. A. 25, 101 Fed. 792, and Chicago v. Sheldon, 76 U. S. 50, 19 L. Ed. 594.

When, at the trial below, all the evidence had been introduced touching the contract, custom, and usage involved in this case, and when the learned trial judge had been fully advised concerning the intentions of the parties, he, on defendant's objection, excluded all evidence offered by plaintiff tending to show that after the assignment of the leases and payment therefor by plaintiff it caused new explorations to be made to show the presence of taconite in the drill holes, and to demonstrate the true quantity and quality of iron ore in the

leased premises. The exclusion of this evidence raised the questions concerning the construction of the contract and its conclusiveness upon the rights of the parties thereto.

For reasons already expressed, the learned trial judge committed no error in excluding that evidence, and the judgment rendered, being for the right party, must be, and accordingly is, affirmed.